Before we begin running the time, there's a problem here with the confidentiality markings in your brief, which are inconsistent with each other, inconsistent with the red brief. We've recently sanctioned people for improper confidentiality markings. What's the basis for the confidentiality markings? Is there any need to have this material marked as confidential? I believe, Your Honor, my memory of what was marked as confidential were a few documents that my opponents had declared confidential. No. You've marked, for example, a name, which is elsewhere revealed in the brief. It looks to be quite careless. I apologize, Your Honor. I'm not sure exactly what's – Would you – Mr. Fay, his identity is marked as confidential in one place. His identity is revealed somewhere else. I think what you should do is to take a hard look at this and see if there's any basis, any need to mark any of this confidential. And why don't you respond to – on that subject a week from today. And if none of this material is appropriately marked confidential, we'd like you to file non-confidential briefs, public briefs. This has really been a plague. It comes up in case after case. The red brief discloses all sorts of things that you mark as confidential in the blue brief. Okay? Do you understand? Thank you. I do. I do. Okay. Why don't you start the time? May it please the Court, this case turns on the issue of collateral estoppel. And it's our assertion that collateral estoppel does not trump the requirements of 35 U.S.C. Section 282. Each claim is deserving of its own independent analysis. We believe that due process requires that each claim be given a full and fair review on its own accord. But we've approved this substantial identity test, right? Yes. And, Your Honor, I believe – With respect to the claims that were found barred here by collateral estoppel, why is substantial identity lacking? I definitely agree, Your Honor, that substantial identity is the issue, and I believe it's lacking here, and I believe the District Court never addressed it. There's several differences in the claims. The primary one is block copolymer and mineral oil in the – The claims may be different, but are the issues related to the claims different? Absolutely, Your Honor. In what way? In the 182 case, which was the earlier invalidated patent, those claims dealt with just a polymer, which is obviously an extremely large chemical class. In the present case, the 237 claims dealt with a block copolymer, which is a subset of polymers, a much narrower class. Which were used in prior hard prosthetic devices, right? We know that in the one tri-block, I believe the silo sheet that used something called a tri-block gel, which if – I can't sit here right now without the benefits of a trial or a hearing on that issue and determine if that's the same as a block copolymer or not, or if it's some class of a block copolymer, I'm not sure. And that's the mistake we believe was made here, is that the court never had a hearing on that issue of block copolymer versus polymeric gel, and whether that made any significant difference here. I think it's important to point out that this court, the Court of Appeals, has never, ever, that I can tell, that from all the cases we reviewed, has never invalidated a second claim that was narrower in view of an earlier invalidated claim that was broader. Did you argue below the block copolymer made a difference? We can't get these documents up on PACER because they're more confidential. Again, the confidentiality problem. Did you make that argument? We were never – yes, we did, Your Honor. The argument we made was that the claim terms in the 237 were different from the claim terms in the 182. The problem is, in this case, is that ALPS had the burden of showing that the claim terms were different. We get the benefit, as the patentee, of validity, presumption of validity. They had the benefit of moving forward with the argument that the block copolymer and polymeric gel are substantially identical. They never made that statement. As a matter of fact, in the motion for reconsideration that we filed, ALPS admitted that block copolymer is a subset of polymeric gel. So this would be the first time in the CAFC's history that we can tell from all the cases that have been cited, there was only one case that we saw on the record where two patents were used. One earlier invalidated, the later one invalidated on collateral estoppel, and that was the case the court cited, which was the mycogen case. But you didn't make any effort to show that block copolymer was different. What you're saying is the burden was on them to show that it didn't make a difference. A couple of things about that, Your Honor. Yes, we definitely believe the burden was on them and that the court made the error. But you didn't make any showing that it was different. Yes. In the record, both in the patent and in the record coming up through the prosecution history, and in the earlier filings with the court, including, remember there's two summary judgment filings in this case. It wasn't just the collateral estoppel summary judgment, there was also the summary judgment under 103 that was filed. And the pleadings that were filed in those cases gave statement of fact, and I refer the court to the statement of facts in both summary judgment. Where did you argue that block copolymer was different and that it wasn't something that was in the prior art and made this patently distinguishable? Your Honor, it doesn't, we respectfully submit it does not matter whether block copolymer was in the prior art. Because the mistake that was made was this domino effect that the Burns case refers to where you start with a collaterally estopped claim, an invalid claim, you apply collateral estoppel and then start looking for the element in the prior art. These claims have to be looked at as a whole. They were not looked at as a whole by the district court. So let me ask you this question then. If you compare the litigated and the non-litigated claims, are they identical in scope? No, Your Honor, they are not. In which way are they different? There's a couple different ways. The primary way is that the original 182 claim that was found invalid called for a polymeric cushioning gel. The 237 patent, which is the one before you today, calls for a particular type of polymer, a block copolymer with mineral oil gel. So therein lies the significant difference between the claims. I mean, you say significant difference. What's the basis for saying it's a significant difference? Well, we start, Your Honor, with the fact that the words are different for starters. Perhaps, but what is the evidence that there's a difference in substance? Throughout the 237 patent, there are block copolymers mentioned, and they're mentioned very, very specifically. They're recited with their chemical structure. And the court could have taken judicial notice that a polymer is a massive subset of chemicals, and a block copolymer is a subset of that massive collection of chemicals. And I continue to assert, Your Honor, that it is not our duty. It's the duty of the party asserting invalidity of the second patent to show that they're different. They could have filed an affidavit from an expert or anyone of ordinary skill in the art that says a block copolymer is the same thing as a polymer, a polymer gel. A block copolymer and mineral oil gel is the same thing as a polymer gel. They filed no affidavit. They filed no evidence at all that they're the same. And in fact, in their reply brief on the motion for reconsideration, they admit that block copolymer is a subset of polymer gel. So that is the error we believe the court made. And once you see that those two claims are not identical, then you must move on. District Court 71 and 72 said, OWW did not explain how the limitation on mineral oil gel as being a foamed or non-block form block copolymer distinguishes Claim 1 of the 237 patent in a meaningful way from mineral oil polymeric gel in the 182. Was the district court incorrect about that? That is precisely the section right there where we believe the error was made. Because if you read that… But it's his characterization of what you argued or didn't argue correct. I don't believe it's correct. I believe that… What's incorrect about it? How did you argue that there was a meaningful difference? To be honest with you, Your Honor, the record is extensive, and I would say that the court could have frankly taken judicial notice of that. That polymers are a major class, block copolymers are subclass. But the point I'd like to make, Your Honor… I guess even the more fundamental question is, did you or did you not make that distinction before the district court? We certainly told the district court that there were different chemicals in the two claims. But I believe the nature of today's questions are indicating the problem we're having, which is it wasn't our burden. It was not our burden. It is your burden to argue against something on which summary judgment is based. You can't just remain silent. Now, you don't have the burden of proof on collateral estoppel, but when somebody says collateral estoppel, if you have an argument against it, you have to say something. And the district court thought you didn't. And you don't seem to be able to point us today where you did argue to the district court that there was a difference between the two and that summary judgment on collateral estoppel wasn't appropriate. My reply to that, Your Honor, is that Alps had the burden, not us. And let me turn to this quote. I'm reading from the Burns case. As the proponent of the estoppel plea, defendant has the burden not only of establishing by preponderance of all the evidence that identical issues are presented by the adjudicated and unadjudicated claims, citing the Westwood case, but also of showing that on this motion for summary judgment there are no genuine issues of material fact relevant to that determination. This is the fundamental error we believe was made. The burden was put on us, and there was no statement that those claims were the same by Alps. Alps never made the statement that those claims were the same. If you turn for a moment from the collateral estoppel issue to the evidence that was introduced from Fay and Comtesse with regard to the prior art. Now, if I read Fay's testimony correctly, he testified that the prior art did, in fact, include the gel composition consisting of block copolymer and mineral oil. Is that correct? I'm sorry, Your Honor. Question again? Mr. Fay testified that the prior art included the use of a block copolymer and mineral oil gel. My recollection is that is what Mr. Fay said. Okay, and your argument there is, well, it wasn't conclusively established that that product was in use, in public use or in commercial sale prior to March 5th, 1995. That's correct, Your Honor. We did not believe there was evidence of that. Well, there was evidence of that, right? I mean, there were – Mr. Fay, for example, testified. You just think that it wasn't conclusively established, right? Yes. You would concede that there was evidence that that was available? Yes, that those were his assertions. And so the question is, what did you introduce that would give the district court a reason to conclude that this product was not available as of that time? There were notes contemporaneous with the alleged liners, which, by the way, were out of circulation, apparently, for a time. And a patient was deceased, and his mother brought them back to him is the story we were told. But if you go back to his contemporaneous notes that Mr. Fay says came with that liner, there were several statements in there that were inconsistent. For one thing, he said it had a pad. The item I saw did not have a pad in the end of it. Another thing he said was he sold the patient socks and sheets or something to go over that device, presumably. So that's inconsistent because the products we're talking about today don't need socks or sheets to go over. So there were a number of inconsistencies there in his contemporaneous notes that he presented. How does using a black block of polymer instead of a generic, how does that change the obviousness determination?  In Klassen, the reference that was cited in the 182 case, and also, I believe, in this case, the Klassen reference dealt with silicone. Silicone is a more firmer, denser item, and it was in the Klassen device. Silicone is a polymer. That was in the prior art. The block copolymer with mineral oil gel is not a silicone, and there's different problems with it. It's a softer material. When you add the mineral oil, it makes it want to leak. So if you're an amputee and you have a pant leg and suddenly you're at some event and you see oil stains on your slacks, it's very disconcerting. So the problem was, how do you keep block copolymer and mineral oil mixture in a fabric without having it go through the other side? And that's the invention that we're here about today. So the silicone material did not have that mineral oil component and was a polymer in Klassen. So polymers apply to that, but block copolymer and mineral oil gel is not a silicone and has a lot of different issues with respect to bleed through in the fabric. It's a much softer, more fluid material. The bleed through was exactly what was litigated the first time and rejected as a basis for distinguishing the polymer. With a polymer, yes, Your Honor. That issue was looked at exactly by this court. Bleed through with any polymer is one issue. Silicone doesn't happen to have much of a bleed through problem. What the district court was looking at was a bleed through issue, not the substance, not the type of gel that you use. Just how do you keep any liquid or gel from bleeding through? There can be no doubt that the success, if you will, of this invention came from the block copolymer and mineral oil. That's what amputees have come to love is the soft feel of that. There's no doubt that the 182 patent that preceded us... Well, you say that, but you didn't put any evidence to that back then, did you? I go back, Your Honor, to as far as... Did you? Did you? Yes. I believe it was before the BPAI and... No, no. In the district court, didn't you put any evidence in as to the reasons for success that related to the softness of the material? I can't be certain of that, Your Honor. I don't recall anything here today about that. Early on, we had a very brief exchange, I think, over the question of whether a tri-block copolymer is a type of block copolymer, which certainly sounds right, and I think Wikipedia would probably so say. Do you acknowledge that that's true? I mean... Well, go ahead. Yeah, without the benefit of having chemists here today, I'm not entirely sure. My feeling is that they're of the same category. Certainly, tri-block... Is a type of block copolymer. I believe it probably is. I believe it probably is. And the contest testified about the products, Silasheath and SSGL, that had used tri-block copolymer, mineral gel mix, right? He did. Yeah. He did testify to that. And that was all... And the question... The only question then is whether those products were, in fact, in existence before March 5th, 1995. No, that's not the only question, Your Honor. That's one of the questions, but there is one other one, which is whether this block copolymer-mineral oil combination will bleed through... But he said that it didn't on the SSGL. He said that they had solved that problem. You know, I'm glad you brought that up, Your Honor, because he said they solved the problem with a robotic process. And then he was specifically asked, when did that robotic process happen? Was it before March of 1995? And he said, no, we didn't sell it. Where is that in the record? Thank you, Your Honor. The robotic process for solving the gel bleed through was not in place at Sillipost until after March 1995. That is at A7824 and A7825. He describes the problem, and then he says they went about trying to solve it with this robotic process. And on page A7825, he was specifically asked, did you sell any of those products before March 1995? And he said, no. Okay. One final question about these claims that weren't found borne by collateral estoppel 18, 19, 21, 22, and 23. And you allege differences between those in the earlier claims. Yes. Such as the mineral oil percentage and signage or hardness and so on. Is it not the case that each one of those limitations was found in prior art prosthetic devices? I don't believe the gel thickness was, Your Honor. At that point in time, gel thickness was something that was kind of counterintuitive. The thought was to make thinner gel, not thicker gel. Well, I thought that Mr. Fay testified explicitly to the gel thickness being in his product. You're refreshing my memory, Your Honor. He did. Okay. And he obviously is an interested party, and it was not corroborated. Okay. Thank you. We'll give you a few minutes. We'll follow up. Mr. Christaldi, is that? Yes, sir, Your Honor. Perfect pronunciation. You ready, Your Honor? Yes. May I please have the court? Your Honor, there are three issues before the court generally today. One is the collateral estoppel obviousness in inequitable conduct. If it's permissible to the court, we'd like to start with inequitable conduct, which is Alps' only issue on cross-appeal. Before you do that, and just frankly, otherwise it's going to split my mind. Yes, sir. Could you address the last point that your opposing counsel and I were discussing, the lead-through problem in the prior art devices, specifically Mr. Fay and Mr. Comtesse's testimony? Yes. First, I would point out, Your Honor, that the District Court of Texas ruling was based on obviousness, not anticipation. But in specific response to your question, I believe a careful reading of Mr. Comtesse's testimony is that they had about a 20% lead-through rate. Mr. Comtesse testified that they would discard any products in quality control that had a lead-through, and that the robotic process was a way to increase their profitability or increase their number of liners that pass through without a lead-through. That was with regard to something called the silo sheet, which was one of several products that Philips has made. But there was also a pre-critical date product called the single-socket gel liner, which there's testimony of Mr. Comtesse and others that the single-socket gel liner was made with a much thicker fabric and never had a lead-through problem at all. And the SSGL was, according to Comtesse's testimony at least, available before the critical date? Yes, sir. And that was cooperated by three other prosthetists as well, Mr. Jim McElhaney, Mr. Galey, and Mr. Uhlendahl. Thank you, Your Honor. Your Honor, with respect to inequitable conduct, this case, as the court has already indicated, really revolved around whether gel bled through the fabric to the other side. In this case, the district court found that there wasn't sufficient evidence of specific intent. And just to use a demonstration, we respect Judge Frost, and we think he's an excellent judge, and we respect his decisions generally. He's an excellent judge on obviousness questions. And I'm glad I was thoughtful, Your Honor. What happened in this case, to use an example, Your Honors, is if there's a pen and a cap and a patent for a pen with a cap, what the inventor in this case did was they showed the pen, they didn't show the cap, and they told the patent office that the only prior art was a pen without a cap. The error that Judge Frost made was he concluded that because the pen was shown to the patent office, there couldn't have been specific intent to not disclose all of the material prior art. In this case, and I'd like to focus on one instance. But the patent office, according to Judge Frost, ultimately got a hold of the cap, and therefore, it didn't make a difference. No, sir. I don't think he concluded that. I think he concluded that it wouldn't. He concluded that there wouldn't have been specific intent because they had some piece of the prior art. The important piece that Judge Frost missed here is that this patent was subject, Your There was an interview in 2007. This patent application was first filed in 1996. So the patent office didn't have the benefit of going to the store and purchasing a current product. These products that the patent office was considering had been in existence many, many years before, and there weren't many samples around. In 1999, eight years before that interview, before the patent office, Silipos itself sent two letters that are up record to Ohio Willowood, one to the CEO of Ohio Willowood, one to the Council of Ohio Willowood. In those letters, they expressly disclosed that they had multiple products, some with gel on both sides of the fabric, some with gel on only one side of the fabric. They sent a product sample, which the letter indicates had gel on only one side of the fabric. They submitted a portion of a patent application that had been filed with the patent office in 1993 claiming gel on only one side of the fabric and a liner. They sent an invoice showing the first sale of that. In the interview in 2007, it's stipulated on the record in the Markman hearing, Mr. Stanley stipulated on the record that none of that evidence was presented to the patent office. When Mr. Colvin, Ohio Willowood's head of research and development and head of patent and licensing, was asked on the stand whether they considered it and why it wasn't disclosed, his response, Your Honors, was that they did consider it and they decided it wasn't prior art and decided not to disclose it to the patent office. The patent office, based on the representation, Mr. Colvin's testimony was that at that interview, and it's consistent with the interview summary, that they told the patent office that all syllabus products that were prior art had gel on both sides of the fabric. Despite the fact that they had two letters from syllabus claiming otherwise, they received a product sample in the past, they received a patent application portion in the past, and they received invoices in the past. They also had contested testimony by them, but they failed to disclose that collaborated that and the testimony of others. The patent office then reissued the patent based on those representations. It's crystal clear in the file wrapper that they had to overcome the syllabus art and based on the representations of the inventor, Ohio Willowood and their counsel, that the prior art had gel on both sides of the fabric. Example that they were shown had gel on both sides. Yes, sir, but it was again one product of syllabus and syllabus had a product line which wasn't disclosed. Dr. Laghi then, the principal of ALPS, then submitted a second reexamination. As this Court knows, reexaminations are ex parte and the basis for submission is a very limited scope of evidence. It can only be prior publications or prior patents. And to corroborate the syllabus art, Dr. Laghi submitted to the patent office Mr. Contessa's testimony. Based on that testimony, the examiner finally rejected all the claims in the 237 patent, finally rejected them. Ohio Willowood then took appeal to the Board of Patent Appeals. It was based on the cooperation when they got to the patent office in their brief and in their oral argument before the Board of Patent Appeals. They told three misstatements to the Board of Patent Appeals to discredit Contessa's testimony. They claimed that Mr. Contessa claimed that he was an inventor. They knew because they had the patent application that fell by the name of Bob Gould was the inventor listed. There's nowhere in Mr. Contessa's testimony where he claims to be the inventor of that. They said that Mr. Contessa contemporaneously continues to receive royalty payments. Mr. Contessa's testimony in his transcript is that the last time he received a royalty payment was in the late 1990s, eight or so years before the interview and 12 years before the Board of Patent Appeals oral argument. They also claimed that he was in competition with Ohio Willowood, implying that he sold prosthetic devices. In fact, the company sells CAD cam technology, computer technology. So what's the evidence that this was intentional? Your Honor, the – they knew of the material. They – Mr. Colvin testified on the stand that they evaluated it, intentionally decided not to disclose it. That is, the record supports what the rec testimony – But that doesn't have to do with the statements in the oral argument before the Board. What's the evidence that the misstatements that you claim were made in the oral argument before the Board of Attention? Sure. The one exception in fair sense to that is if the evidence is so material and the misstatements were known to be material and withheld. I mean this was an appeal before the Board of Patent Appeals based on rejections on that very art, relying on that specific record. In a thorough sense, we gave an example. We stated that type of – we pointed to a false affidavit as being the exception. Does this rise to that level? I believe it does, Your Honor. The basis for overturning the decision was because the patent office found that specifically the contest was interested. Based on those three statements, they found that it was uncontested that he was an interested party, which is not true. And based on that, they discredited his testimony and reversed the patent examiner. It was but for material evidence because it did result in the rejection of all the claims in the patent. And that specific evidence was the basis for the oral argument for the briefing. And they knew. They attended those depositions, the counsel. The record was there in front of them. They made those representations with a specific intent to discredit Mr. Contest. The basis of the argument, Judge, was that he was interested party, and therefore, there's not sufficient cooperation. You heard Mr. Stanley say it again today that it's not cooperated. That's simply not true. There's a ton of cooperation, but the reality is the misstatements were with respect to whether he was an interested party. But we go back to the earlier re-examination. And in the earlier re-examination, they specifically withhold the same type of part. They withheld the cap. And then when Dr. Laghi, through the re-examination, was able to get some evidence of the cap before the patent office, they purposely discredited that evidence by making multiple misstatements about the interest of the party so that they could argue that it wasn't cooperated and shouldn't be considered. And that resulted in the reversal of the Board of Patent Appeals. I would submit to your honors that although the Therosense decision certainly heightened the standard for inequitable conduct, they did not do away with it. And this type of activity, I would submit, is the exact type of activity. The duty of candor that lawyers have before judges is similar to the duty of candor that inventors, patent holders, and lawyers have to the Board of Patent Appeals and to the patent office. The NPEP is very clear that things like communications from competitors in NPEP 2001.06 is specifically listed as the type of information that needs to be disclosed. There's case law to support that if there's any questionable information that needs to be provided, it should be resolved in favor of disclosure and advocacy. Here, they affirmatively made the statement that all prior art products that they were They didn't disclose the information. When it finally came to light, they furthered their activity by telling the patent office that that evidence was incorrect and that the person who provided the testimony was interested based on three factual assertions that were simply not true. I take it that your cross-appeal is not conditional. That is to say that if you were to prevail on the main appeal, nonetheless, you would continue to urge reversal on the cross-appeal? I would, Your Honor, for multiple reasons. The first being probably one I suspect. Honestly, Your Honor, that's not the first. That would be a reason, Your Honor, but the primary reasons are these clients have been in much litigation together. There are claims in this patent that were not yet asserted against Alps but remain outstanding. They were not invalidated by the district court. And wouldn't be, in effect, rendered invalid by any ruling upholding the district court in this case? Correct, Your Honor. Okay. There are also other related patents that are currently in litigation before various district courts right now that are related to this patent as well, and this would have implication. This is an important issue. Patents, as the court knows, are a matter of public importance. This affects not just my client, Alps, but it affects a lot of other individuals. This 237 patent has been asserted and litigated against other defendants around the country, and so we believe that this is important. There are other, for instance, there are other former litigants who have entered into license agreements and will still be paying on the claims that won't be invalidated by this particular patent if the inequitable conduct is not found and the patent is not ultimately found to be invalid due to that. Your Honor, if it's okay, I'd like to – if you have any more questions about inequitable conduct, I'd be happy to address those. If it's okay with the last few minutes I have here, I'd like to address collateral estoppel a little bit. The court, very correctly in their questioning of Mr. Stanley, hit the nail on the head that the precise issue that was litigated before the Texas District Court is the issue that was determinative in this case, and that issue was whether it would have been obvious to one of ordinary skill at the art in the time of the invention to substitute out a fabric that was thicker or less permeable to have no gel bleed through or solve that gel bleed through problem. That was the case that was litigated in Texas. That was the exact issue before this court. Here, case law is clear that claims do not have to be identical. This business about block copolymer and polymer that Mr. Stanley raises, even assuming arguendo that there's a distinction between those, as I think Judge Bryson, you may have remarked on, both of those things are embodied in the prior art. There's – the record is complete with evidence that the Silopos products were made with a tri-block copolymer, which is a block copolymer and is a polymeric material. The only issue that has patentable significance in these cases is whether gel bleeds through. A reading of the patent file wrapper indicates, Your Honors, that the issue that helped Ohio Willowit get over, the only issue that helped them get past the Silopos prior art, was their distinction of their product having gel on one side of the fabric and all Silopos products having gel on both sides of the fabric. That was the only patently determinable issue. This business about the claims needed to be identical is simply not supported by the case law. Your Honors, with respect to obviousness, we think that the district court applied the correct standards. We believe that the techniques that are claimed in claims 18, 19, 21, 22, and 23 were obvious, common sense, and ordinary. Yes, sir. Why don't you – I've read the testimony of Comtesse and Fay. Assuming that their products were in fact pre-critical date products, then they do seem to cover the waterfront. And I don't understand your opposing counsel to be sharply disagreeing with that. The question is timing. What is your evidence, other than the testimony of Comtesse and Fay themselves, that indicates that those products, particularly the Fay liner, let's say. Sure. The FSGL, I see the Prosthetists and so forth. How about the Fay liner? Sure. I'd be happy to address both of those. The Fay liner specifically, Mr. Fay had contemporaneous medical records as to when he created and fit the liner. He had the molding machines still that he used to make the liner. He had the invoices that he used – Having the molding machines doesn't tell you when he made the liner. Yes, sir. Yes, sir. But this is cooperating evidence. He also had invoices when – I'm not sure that – no one's disputing that the liners were made. The question is when they were made. Okay. Yes, sir. He had contemporaneous medical records from the patients that they were made for. He had invoices to show the polymer and the mineral oil that he purchased at the time to make the products. He had billing records to show that he billed the insurance company for the product. He had checks received to show that the checks were received for having bought the product. It's clear, Your Honor. I don't know that there could be more evidence than what he had that he made the product at that time, and he sold it. Was that all in the summary judgment record? I believe it is, Your Honor. And it's certainly in his testimony because I asked him questions about each of those and authenticated each of those documents. With respect to the Silopost products, those products were advertised in a publication called O&P Business News, Orthotics and Prosthetics Business News, in advertisements prior to the critical date. Those were some of the documents that were subject to the reexamination proceeding, and they're part of the reexamination record. But the products themselves were advertised. There were at least three prosthetists who provided testimony that they used and fitted those products on. And frankly, Mr. Kanye himself, the inventor of the 237 patent, testified and signed declarations that his prosthetists fit him with a silo sheath product, a Silopost product. He liked it, and it wasn't durable enough for him, so he wanted to create something more durable. In the Texas District Court case, Ohio Willwood admitted that the specimen that was before the Texas District Court was a pre-critical date silo sheath liner. So there's – in my opinion, there's an abundance of evidence that those products existed before, Your Honor. I think I have bitten into my rebuttal time. Okay, thank you. Thank you, Your Honor. Mr. Stahl, you have two minutes. Thank you, Your Honor. I think the overriding question after hearing several minutes of how my client has no invention, why did Siloposts, why did Alps have direct evidence of copying? And I cite to you A9385, which is a letter in which Alps is showing they want to copy the Alpha Liner. And I point you to A9379 to 9383, where Siloposts had an internal memorandum where they want to copy the Alpha Liner. If all of these inventions that my client is claiming is block copolymer mineral oil gel on only one side of a liner, if that was in the prior art, why do these two companies want to copy the Alpha Liner? It makes no sense. So that's that item. With respect to the Court's question earlier today about what evidence was before Judge Frost, I take the Court to Custom Accessories v. Jeffrey Allen. An examiner's decision on an original or reissue application is evidence the Court must consider in determining whether the party asserting invalidity has met its statutory burden by clear and convincing evidence. And that, upon reissue, the burden of proving invalidity is made heavier. The burden was tremendously heavy here and the Court should have considered that. The District Court should have considered the reexaminations and the BPAI decision and did not. Finally, on this issue of inequitable conduct, there is absolutely none. The points that counsel is raising, and I'm sorry my memory is drawing a blank here, but his points with respect to how a prosecuting attorney misled the BPAI is not at all consistent with the record. Mr. Comtesse is an inventor. It is clear he's an inventor. He all but says it. He just doesn't use the word inventor. The reason they don't want to have him be an inventor is because then his testimony would have to be corroborated. So that is clear. And I'll answer any other questions the Court might have with respect to any of those items, but I wanted to make sure. I think we're out of time now, Mr. Stanley. Thank you, Your Honor. Thank you very much. The case is submitted. We thank both counsel.